TRACY J. FRAZIER, OSB No. 107125
Email: tfrazier@aldridgepite.com
PETER J. SALMON, OSB No. 141860
Email: psalmon@aldridgepite.com
ALDRIDGE PITE, LLP
621 SW MORRISON STREET, SUITE 425
PORTLAND, OR 97205
TELEPHONE: (503) 222-2026
FACSIMILE:  (503) 222-2260

Attorneys for Defendants Bank2 and Dovenmuehle Mortgage, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON – PORTLAND

| | |
|---|---|
| CANDACE IRON HAWK, an individual, and ROBERT VAN PELT, an individual,<br><br>          Plaintiffs,<br><br>    v.<br><br>BANK2, an Oklahoma domestic banking corporation; and DOVENMUEHLE MORTGAGE, INC., a Delaware corporation,<br><br>        Defendants. | Case No. 3:15-CV-01374-PK<br><br>**DEFENDANTS BANK2 AND DOVENMUEHLE MORTGAGE, INC.'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT, AND SUPPORTING MEMORANDUM** |

**Table of Contents**

I.    MOTION FOR SUMMARY JUDGMENT.................................................................1

II.    DEFENDANTS' UNDISPUTED FACTS ............................................................2

    A.    Origination of the Loan and Investor Guidelines ................................. 2

    B.    Securitization of the Loan by Bank2 ...................................................... 3

    C.    Plaintiffs' Default in Payments and Loss Mitigation Activity.............................. 5

        1.    Default in Payments as of June 2013.................................... 5

        2.    Plaintiffs' First Loss Mitigation Application............................... 6

        3.    Plaintiffs' Second Loss Mitigation Application ........................ 7

        4.    Plaintiffs' Third Loss Mitigation Application ........................... 8

    D.    Assignment of the Deed of Trust, Substitution of Trustee, and Foreclosure.......... 9

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
    CAUSE OF ACTION FOR VIOLATION OF RESPA BECAUSE THEY
    APPROPRIATELY CONSIDERED AND RESPONDED TO ALL LOSS
    MITIGATION APPLICATIONS ....................................................................10

    A.    Plaintiffs' Allegations of a RESPA Violation – 12 C.F.R. § 1024.41 ................ 10

    B.    Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs'
        First Loss Mitigation Application...................................................... 10

    C.    Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs'
        Second Loss Mitigation Application .................................................. 11

    D.    Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs'
        First Loss Mitigation Application...................................................... 12

    E.    Plaintiffs Do Not Identify Any Qualified Written Request or Notice of
        Error to Which Bank2 or DMI Failed to Respond.................................. 13

    F.    Conclusion – No Violation of RESPA Can be Established................................. 14

IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
    DECLARATORY JUDGMENT CLAIM BECAUSE BANK2 HIS MET THE
    DEFINiTION OF A BENEFICIARY UNDER OREGON LAW AT ALL TIMES .........15

    A.    Legal Authority Governing Declaratory Judgment Claims ................................. 15

B.   The Nonjudicial Foreclosure Process Is Valid because Bank2 Meets the
       Definition of a Beneficiary and Because MERS Can Assign the Deed of
       Trust ................................................................................................................ 16

C.   Plaintiffs' Misunderstanding of the GNMA MBS Loan Guarantee
       Program Does Not Change the Fact that Bank2 Has Met the Definition of
       a Beneficiary under Oregon Law at all Times ...................................................... 16

       1.   Statutory Basis for the MBS Guarantee. .................................................. 17

       2.   The GNMA MBS Guide Provisions Make Clear that the Issuer of
              the Mortgage Backed-Securities Maintains Ownership of the
              Loans in the Pool subject to the Security Interest of GNMA. ................. 18

       3.   The Flow of Money Under the Securitization Transaction Shows
              that Bank2 is the Owner of the Loan ....................................................... 18

       4.   GNMA Required Forms Establish that GNMA Guarantees
              Payments to Security Holders and Has a Security Interest in the
              Loans that Back Each Security. ............................................................... 19

       5.   Courts Have Found GNMA Has a Security Interest Only in Loans
              Pooled as Collateral for the Guaranteed Securities................................. 19

V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
       PLAINTIFFS' BREACH OF CONTRACT AND BREACH OF THE
       COVENANT OF GOOD FAITHA ND FAIR DEALING CAUSES OF ACTION
       BECAUSE DEFENDANTS COMPLIED WITH the hud section 184 guidelines
       applicable to THE SERVICING OF THE LOAN AT ISSUE .........................................20

A.   Defendants Complied with the Applicable Servicing Guidelines ........................ 20

B.   No Breach of Contract Occurred Because Plaintiffs Never Tendered Any
       Partial Amount Due and Were Not Required to Accept the Plaintiffs'
       Proposed Repayment Plan Terms ........................................................................ 21

       1.   The Oral Offers to Tender Partial Payments are Unsupported by
              the Facts and Cannot Form the Basis of a Breach of Contract
              Claim....................................................................................................... 22

       2.   The Rejection of a 20 Month Repayment Plan Does Not Breach
              HUD Section 184 Guidelines or the Underlying Contract ...................... 23

C.   No Breach of the Covenant of Good Faith and Fair Dealing Exists
       Because Defendants Complied with the HUD Section 184 Guidelines, and
       Plaintiffs Rejected the Loan Repayment Plan Offered to Them........................... 24

VI.     SUMMARY JUDGMENT IS WARRANTED ON THE OUTPA CLAIM ....................25

        A.      Legal Standard for a claim of Violation of the OUTPA ....................................... 25

        B.      Plaintiffs' Theory that Defendants Have No Financial Incentive to Pursue
                Loss Mitigation is Contrary to the Undisputed Facts ........................................... 26

        C.      Plaintiffs Cannot Meet the Legal Standard for the Other Elements of an
                OUTPA Cause of Action .................................................................................... 26

VII.    CONCLUSION......................................................................................................27

**Table of Authorities**

**Cases**

*Fed. Nat. Mortgage Ass'n v. Goodrich*, 275 Or. App. 77 __ P.3d __ (2015) .............................. 16

*Fleshman v. Wells Fargo Bank, N.A.*, 27 F. Supp. 3d 1127, 1140 (D. Or. 2014) ............ 25, 26, 27

*Flores v. EMC Mortgage Co.*, 997 F. Supp. 2d 1088, 1111-12 (E.D. Cal. 2014) ....................... 16

*Iron Horse Eng'g Co. v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 421 (2004) ................ 24

*Morrow v. Red Shield Ins. Co.*, 212 Or.App. 653, 661-62 (2007) ................................................. 24

*Norton v. Nelson*, 252 Or.App. 611, 619–20 (2012) ................... 25

*The Hipage Co., Inc.*, 589 F.Supp.2d 602, 615 (E.D.VA. 2008) ................................................. 16

**Statutes**

12 C.F.R. § 1024.35 ....................................................................................................... 13, 14

12 C.F.R. § 1024.41 ..................................................................... 10, 11, 12, 13, 14, 20

ORS 645.607 ...................................................................................................................... 25

ORS 645.608 ............................................................................................................. 25, 26, 27

ORS 646.605 ................................................................................................................. 25, 26

ORS 86.735 ........................................................................................................................ 15

**Regulations**

Declaratory Judgment Act, 28 U.S.C. § 2201(a) ......................................................... 15

Real Estate Settlement Procedures Act ................................................................. 10, 11, 12, 14

Section 184 of the Housing and Community Development Act of 1992, P.L. 102-55 . 1, 3, 14, 19,

20, 21, 23, 24, 27

Defendants Bank2 and Dovenmuehle Mortgage, Inc. ("DMI") (collectively, "Defendants") submit the following Motion for Summary Judgment, or Alternatively, Partial Summary Judgment, as to the Second Amended Complaint filed by Plaintiffs Candace Iron Hawk and Robert Van Pelt ("Plaintiffs"), including supporting memorandum.

## I.    <u>MOTION FOR SUMMARY JUDGMENT</u>

In compliance with Local Rule 7-1, the parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

Defendants Bank2 and DMI move for summary judgment, or alternatively, partial summary judgment, as to each of the five causes of action asserted by Plaintiffs in their Second Amended Complaint: Violation of RESPA, Breach of Contract, Declaratory Judgment, Breach of the Covenant of Good Faith and Fair Dealing, and Violation of the Oregon Unlawful Trade Practices Act (OUTPA). The undisputed facts establish that the loan at issue was made pursuant to Section 184 of the Housing and Community Development Act of 1992, P.L. 102-55. The guidelines promulgated by the Secretary of Housing and Urban Development (HUD) govern the servicing of the loan, including loss mitigation.

The undisputed facts show that Defendants serviced the loan in compliance with the HUD Section 184 Guidelines, including loss mitigation. Specifically, they considered all applications for loss mitigation submitted by Plaintiffs, provided written acknowledgments of receipt and identifying missing documents, and provided written decisions on each application. The Plaintiffs disagree with the loss mitigation decisions made by Defendants, and essentially ask this Court to find that Defendants had to offer loss mitigation options not mandated by the HUD Section 184 Guidelines. However, this disagreement does not and cannot form a basis for

claims premised upon Violation of RESPA, Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, or violation of OUTPA.

Plaintiffs' Declaratory Judgment claim rests on the premise that Bank2 does not meet the definition of a beneficiary under Oregon law. The undisputed facts show that, at all times since loan origination, Bank2 has owned the loan at issue and been the party entitled to receive payment. Bank2 undisputedly securitized the loan at issue through a GNMA-backed securitization, which Plaintiffs misapprehend as a sale of the loan; that theory contradicts the GNMA Mortgage-Backed Securities Guide provisions and defies common sense given the flow of payments required by GNMA guidelines. As a result, Defendants are entitled to summary judgment on the Declaratory Judgment cause of action.

## II.    DEFENDANTS' UNDISPUTED FACTS

The undisputed facts derived from the following sources: verified discovery responses; transcripts of deposition testimony; the declaration of Anthony Fiore of DMI filed as docket 24; the declaration of Ross Hill of Bank2 filed as docket 25, the declarations of Cynthia Delgado and Gene Watson of Bank2 filed as docket numbers 54 and 55; the Gene Watson declaration filed as docket 76; the declaration of Nate Atchison filed as docket 98; the declarations of Defendants' counsel filed as docket numbers 27, 53, and 77; matters subject to judicial notice; and, the concurrently filed declaration of Peter J. Salmon.

### A.    Origination of the Loan and Investor Guidelines

On February 11, 2010, Plaintiffs executed a promissory note and deed of trust in the original principal amount of $158,950.00. (Docket 25, ¶ 3.) The Deed of Trust was recorded in the Official Records of Multnomah County, Oregon on February 17, 2010 as Document No. 2010-022479 and encumbers the real property commonly known as 11421 Southeast Pardee

Street, Portland, OR 97266 ("Subject Property"). *Id.*, ¶¶ 1, 3. Plaintiffs do not dispute that Bank2 is identified as the lender in the promissory note and in the Deed of Trust. (Dkt. 45, Exh. 1).

Bank2 has possession of the original promissory note. (*See* Responses by Bank2 to Plaintiffs' Second Set of Interrogatories, Response to Interrogatories 2 and 3, attached to Dkt 53, Exh. B). The declaration of Gene Watson of Bank2 specifies at paragraph 6 that "Bank2 at all times has been the owner of the loan and the party to whom payments are due from Plaintiffs." (Dkt. 55, ¶ 7.) Mr. Watson also testified that: Bank2 is the owner of the loan and did not sell it (Dkt 77, Watson Deposition, 10:22-24); Bank2 securitized the loan, retained ownership and servicing rights (*Id.* at 11:8-10); and, Bank2 did not "sell the loan into the pool. We retain ownership." (*Id.* at 12:21-25, 13:1.) In addition, Cynthia Delgado of Bank2 specified that Bank2 did not sell the loan at issue after origination and remains the owner. (Dkt 54, ¶ 4.)

The loan at issue was made under Section 184 of the Housing and Community Development Act of 1992, P.L. 102-55. (Dkt 25, ¶ 4.) Bank2 services the loan at issue pursuant to HUD Section 184 Guidelines. *Id.* DMI has subserviced the loan at all relevant times. *Id.* ¶ 6.

HUD promulgates its own guidelines for servicing of Section 184 loans, including loss mitigation programs. (Dkt 25, ¶ 4.) These guidelines do not require Bank2 to offer loan modifications to borrowers. *Id.* DMI serviced the loan and evaluated Plaintiffs' loss mitigation applications pursuant to the HUD Section 184 guidelines, and consulted with Bank2 regarding loss mitigation and foreclosure at all times since loan origination. *Id.*

**B.    Securitization of the Loan by Bank2**

Bank2 is an approved Issuer of Ginnie Mae Mortgage Backed Securities (MBS) under the Ginnie Mae II MBS program for securities backed by single family loans. *See* Dkt 77, Exh. C, D001377-D001380. The loan at issue is included in Bank2's pool number 718520, and

GNMA assigned the security the CUSIP number 36202FE69. *Id*., documents D001387 and D001381. Bank2 pledged this loan as collateral for the security it sold. (Dk 55, ¶¶ 4, 5.)

GNMA's website has a section entitled "Ginnie Mae's Role in Housing Finance." In that section, GNMA explains in plain terms that it does not "buy loans." Instead, it explains that:

> Ginnie Mae's business model significantly limits U.S. taxpayers' exposure to risk associated with secondary market transactions. Its strategy is to guarantee a simple pass-through security to investors rather than buy loans and issue its own securities. Because private lending institutions originate eligible loans, pool them into securities and issue Ginnie Mae MBS, the corporation's exposure to risk is limited to the ability and capacity of its MBS Issuer partners to fulfill their obligations to pay investors. By guaranteeing the servicing performance of the Issuer – not the underlying collateral – Ginnie Mae insulates itself from the credit risk of the mortgage loans.

(Dkt 52, Defendants' Request for Judicial Notice, Exh. A, emphasis added; www.ginniemae.gov/consumer_education/Pages/ginnie_maes_role_in_housing_finance.aspx.)

Bank2 securitized the loan at issue in 2010, issuing securities for sale to the public and receiving cash in exchange for the sale of those securities. (Nate Atchison Declaration, Dkt 98, ¶ 5). Since this securitization, Bank2 has met its requirement to make funds available on a monthly basis for distribution to the holders of the security. *Id*. at ¶ 6. Bank2 transfers funds each month into a custodial account at Bank2 that is held in trust for the benefit of the GNMA-backed security holders. Bank2 makes the payment required even if borrowers on the underlying loans do not make their monthly payments to Bank2. *Id*. The Bank of New York, as administrator and trustee for the GNMA-backed security program, drafts the full amount from that account in order to make the monthly payment to the security holders. *Id*.

Since the securitization of the loan at issue in 2010, Bank2 has been required to, and has actually made, monthly guaranty fee payments to GNMA as a condition of maintaining the GNMA guaranty of payments to security holders. Dkt 98, ¶ 7. Bank2 makes this monthly

guarantee payment to the same custodial account administered by the Bank of New York that is referenced in the previous paragraph of this declaration. *Id*.

C.    **Plaintiffs' Default in Payments and Loss Mitigation Activity**

No dispute exists that the Plaintiffs failed to timely make their June 2013 contractual payment. (SAC ¶ 12.) The undisputed facts also establish that the Plaintiffs did not have the money to bring the loan current starting as of July 2013, and the Defendants appropriately considered all loss mitigation applications submitted by Plaintiffs.

1.    **Default in Payments as of June 2013**

Plaintiffs admit that they missed their June 2013 monthly mortgage payment. (SAC, ¶ 12). They also admit that they did not have the money to make that June 2013 payment when they allegedly offered to on July 1, 2013. (Iron Hawk Depo., p. 19:14-25, Exh. A to Salmon Decl.). Specifically, Plaintiff Iron Hawk admitted that she did not have sufficient funds in any of her bank accounts to make the payment on July 1, 2013. *Id*. at 27:8:16. Instead, Plaintiffs planned to borrow money from a relative and to use $250 of previously undisclosed cash for a side business of selling pallets. *Id*., pp. 19:7-13, 20:5-10. Plaintiffs admit that they did not tender a payment at this time, or that Defendants rejected a payment. *Id*. at p. 19:22-25.

While Plaintiffs allege that the Defendants refused to accept the single payment that she claims they would have made on July 1, 2013, DMI's loan servicing notes do not show that either Bank2 or DMI rejected any verbal offer by Plaintiffs to make a single payment on July 1, 2013, or any other date. (Document numbers D000667-D000669, Dkt 53, Exh. C.) Candace Iron Hawk did not keep any notes of her conversations with DMI or Bank2, does not recall when she spoke with representatives of DMI or Bank2, and does not recall the names of persons at DMI or

Bank2 with whom she claims to have spoken about this default in payments. (Salmon Decl., Exh. A, Iron Hawk Depo, 10:21-25, 11:1-22.)

During a telephone call with Plaintiffs on September 7, 2013, DMI advised the Plaintiffs that they needed to "come up with 2 pmnts prior to EOM" (Dkt 53, Exh. C), meaning that two payments would be accepted even though the loan was contractually due for the June 2013 payment. Plaintiffs' bank statements for the period from June 27, 2013, through September 27, 2013, submitted with their First Loss Mitigation Application, show that they either were overdrawn each banking period, or had a maximum of $157.38 as an ending balance. (Salmon Declaration, Exh. B, D000505-D000524, D000568-D000576, D000442-D000446.)

### 2.    Plaintiffs' First Loss Mitigation Application

Plaintiffs submitted a loss mitigation application on August 31, 2013. (Dkt 24, ¶ 7.)  DMI acknowledged receipt of the application by letter dated September 9, 2013 (Dkt 24, Exh. B). DMI analyzed the documents and information submitted, identified additional financial information and documents needed to complete the application, and sent a missing documents letter dated September 10th. *Id.*, Exh. C.

DMI's loan servicing notes show that it e-mailed the Plaintiffs on September 25, 2013, to update information on the financial package. (Dkt 53, Exh. C, document number D000668.) The notes also reflect that Defendants verified that the Plaintiffs' monthly income was $2,445.00 and monthly expenses were $2,135.06 as of November 5, 2013. *Id.* at D000669.

Defendants determined that the Plaintiffs did not qualify for a loan repayment plan based upon the amount of the default and the small monthly surplus of income over expenses. (Dkt 24, ¶ 8.) Bank2 was not required to and did not offer loan modifications as a loss mitigation

MEMO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY                    Page 6
JUDGMENT

alternative. (*Id.*; Dkt 25, ¶ 4.) As a result, DMI sent a letter to Plaintiffs dated November 20, 2013, advising that their request for loss mitigation was denied. (Dkt 24, ¶ 8, Exhibit D.)

At paragraph 19 of the SAC, Plaintiffs allege they "attempted to make a partial payment" by offering to pay $2,600. However, Plaintiff Iron Hawk testified at deposition that she actually offered $2,200, and the source of money would have been from pallet sales and borrowing; she only had $600 to $700 from pallet sales at that time. (Salmon Decl., Exh. A, Iron Hawk Depo, 21:21-25, 22:1-2). On December 10, 2013, DMI received a telephone call from a loan counselor for the Plaintiffs. (Dkt 24, ¶ 9.) The counselor indicated that Mr. Van Pelt had income and the Plaintiffs were interested in pursuing loss mitigation again. *Id.* Based on this call, DMI sent a loss mitigation application to the e-mail address provided by the loan counselor. *Id.*

### 3.    Plaintiffs' Second Loss Mitigation Application

DMI did not receive a new loss mitigation application from the Plaintiffs until February 4, 2014. (Dkt 24, ¶ 10.) DMI acknowledged receipt of that application, analyzed the documents and information submitted, and identified additional financial information and documents needed to complete the application. *Id.* True and correct copies of the February 4, 2014, and February 19, 2014, missing documents letters are attached as Exhibits E and F to Docket 24.

DMI notified Plaintiffs by letter dated February 28, 2014, that their loss mitigation application was complete. (Dkt 24, ¶ 12, Ex. G.) Bank2 verified Plaintiffs' monthly income at $4,522.00 and monthly expenses, including the house payment, was $2,427.96. (Dkt 53, Exh. C, D000677-678). Based on this and the other information submitted, Defendants determined that Plaintiffs could afford a repayment that would raise their monthly expenses to a total of $2,767.36, or an increase of 339.40 per month, leaving $1,754.64 in disposable income. *Id.* and Dkt 24, ¶ 12.) Bank2 offered Plaintiffs an 8 month repayment plan by a letter dated April 1,

2014. (Dkt 24, ¶ 12; Ex. H.) The monthly payment amount in excess of the regular principal and interest payment placed in a suspense account. *Id.*

Plaintiffs rejected the Repayment Plan (Dkt 24, ¶ 13), appealing the Repayment Plan offer by letter dated April 9, 2014. Plaintiffs claimed they had additional expenses that Defendants did not account for in the offer. *Id.*, Ex. I. Defendants evaluated the Plaintiffs' appeal and determined that the Plaintiffs' financial situation was evaluated appropriately. (Dkt 24, ¶ 14.) As a result, DMI sent the Plaintiffs a letter dated April 24, 2014, denying the appeal. *Id.*, Ex. J.

### 4.    Plaintiffs' Third Loss Mitigation Application

DMI received another loss mitigation application from Plaintiffs on June 6, 2014. (Dkt 24, ¶ 15.) DMI acknowledged receipt of that application, analyzed the documents and information submitted, and identified additional financial information and documents needed to complete the application. *Id.* The June 12th acknowledgment letter, and June 30th and July 10th missing documents letters, are attached to DMI's declaration as Exhibits K, L, and M. When Plaintiffs did not respond or provide the missing documents, DMI sent Plaintiffs a letter dated July 23, 2014, advising they had failed to provide all the documents required by Defendants for consideration of loss mitigation retention options. (Dkt 24 ¶ 16, Ex. N.)

On July 28, 2014, DMI received additional documents from Plaintiffs, apparently seeking to supply missing information from their June 6, 2014, loss mitigation application. (Dkt 24, ¶ 17.) Defendants treated these late submissions as a new loss mitigation application by utilizing the information submitted by Plaintiffs starting on June 6, 2014, and through July 28, 2014. *Id.* Therefore, DMI sent Plaintiffs an August 5, 2014, loss mitigation acknowledgment letter and an August 11, 2014, letter acknowledging a complete application. *Id.*, Exs. O, P.

DMI and Bank2 determined that the Plaintiffs did not qualify for a loan repayment plan based upon the excess of expenses over income. (Dkt 25, ¶ 4; Dkt 24, ¶ 18.) Bank2 did not, and was not required, to offer a loan modification as a loss mitigation alternative. (Dkt 24, ¶ 4.) As a result, DMI sent a letter to Plaintiffs dated September 9, 2014, advising that their request for loss mitigation was denied. (Dkt 24, ¶ 18, Ex. Q.) Plaintiffs offered to pay $7,000 toward the arrears in August of 2014 based upon an insurance settlement received by Robert Van Pelt. (Salmon Decl., Exh. A., Iron Hawk Depo, pp. 24:24-25, 25:1-9). However, even with the $7,000 offer, Plaintiffs did not have the ability to bring the loan current because their monthly expenses exceeded their monthly income.

### D.    Assignment of the Deed of Trust, Substitution of Trustee, and Foreclosure

Gene Watson of Bank2 testified that he is a limited signing officer for MERS, and that he executed the assignment of the deed of trust from MERS to Bank2 in that capacity. (Dkt. 55, ¶ 5.) This same declaration explains that the MERS Rules of Membership do not permit any foreclosure to proceed in its name, regardless of specific Oregon law regarding MERS. *Id.* at ¶ 6. A MERS Corporate Resolution identifies Mr. Watson as one of the MERS limited signing officers. (Dkt 76, Exh. A). The Corporate Resolution establishes that: Bank2 is a MERS member (¶ 1); the signing officers shall follow the MERS Rules of Membership (¶ 3); and, signing officers may "assign the lien of any mortgage loan naming MERS as the mortgagee when the Member is also the current promissory note-holder." *Id.*

Mr. Watson executed the assignment of Deed of Trust from MERS to Bank2 that Plaintiffs attach to their Memorandum. (Dkt. 67, Exh. 8). The date of the assignment is January 16, 2015, after the effective date of the Corporate Resolution designating Mr. Watson as a limited signing officer of MERS. At that time, Bank2 had possession of the promissory note and

remained the owner of the note. Bank2 later executed the Appointment of Successor Trustee on February 10, 2015, to designate Clear Recon Corp. as the new trustee under the deed of trust. Plaintiffs attached this as Exhibit 3 to dockets 45 and 45-3.

### III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CAUSE OF ACTION FOR VIOLATION OF RESPA BECAUSE THEY APPROPRIATELY CONSIDERED AND RESPONDED TO ALL LOSS MITIGATION APPLICATIONS

Plaintiffs allege that Defendants violated the Real Estate Settlement Procedures Act ("RESPA") by failing to provide a written response to a loss mitigation application and failing to respond to a Notice of Error/Qualified Written Request. (SAC ¶¶ 34, 35, and 38). On that basis, they claim damages in the "approximate amount of $170,000". *Id.* at ¶ 43. However, the undisputed facts establish that Defendants responded to all loss mitigation applications submitted by the Plaintiffs, provided written decisions on applications and an appeal, and responded to all other inquiries. Consequently, Plaintiffs cannot establish a violation of RESPA.

### A.    Plaintiffs' Allegations of a RESPA Violation – 12 C.F.R. § 1024.41

Plaintiffs cite to 12 C.F.R. § 1024.41 as the statutory guidance for the handling of loss mitigation applications. This section sets forth specific time period by which a lender must: provide written acknowledgment of receipt of loss mitigation applications; advise whether applications are complete; identify missing information and/or materials; complete reviews of applications; and, provide decisions on applications and appeals. As discussed below, no dispute can exist that Defendants fulfilled their obligations under these regulations.

### B.    Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs' First Loss Mitigation Application

Plaintiffs submitted a loss mitigation application on August 31, 2013. (Dkt 24, ¶ 7.)  DMI acknowledged receipt of that application, analyzed the documents and information submitted, and identified additional financial information and documents needed to complete the

application. *Id.* DMI sent an acknowledgment letter and missing documents letter on September 9th and 10th, 2013, respectively. Dkt. 24, Exhs. B and C.

DMI e-mailed the Plaintiffs on September 25, 2013, to update their financial information. As of November 5, 2013, Plaintiffs' monthly income was $2,445.00 and monthly expenses were $2,135.06. (Dkt 53, Exh. C, document D000668-669.) Therefore, Defendants appropriately determined that Plaintiffs did not qualify for a loan repayment plan due to the amount of the default and the small monthly surplus of income over expenses. (Dkt 24, ¶ 8.)

Bank2 was not required to and did not offer loan modifications as a loss mitigation option. *Id.*; Docket 25, ¶ 4. As a result, DMI sent Plaintiffs a letter dated November 20, 2013, advising that their request for loss mitigation was denied. (Docket 24, ¶ 8, Exh. D.) These undisputed facts establish that the Defendants satisfied their obligations under 12 C.F.R. § 1024.41 with regard to the First Loss Mitigation Application.

C.    **Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs' Second Loss Mitigation Application**

Plaintiffs' loan counselor called DMI on December 10, 2013, advised that Mr. Van Pelt had income, and indicated Plaintiffs wanted to pursue loss mitigation again (Dkt 24, ¶ 9.)  Based on this call, DMI e-mailed a loss mitigation application to the loan counselor. *Id.*

Plaintiffs did not send a new loss mitigation application until February 4, 2014. *Id.* at  ¶ 10, Exh. E. DMI acknowledged receipt of that application that same day, analyzed the documents and information submitted, identified additional financial information and documents needed to complete the application. DMI sent a missing documents letter to Plaintiffs dated February 19, 2014.  *Id.*, Exh. F. After receiving more information, DMI sent Plaintiffs a February 28, 2014, letter advising that their loss mitigation application was complete. *Id.* at ¶ 12, Ex. G.

Based upon the increased income and the monthly surplus of income over expenses ($4,522 in income, $2,427.96 in expenses), Defendants determined the Plaintiffs could afford a repayment plan with an increased monthly payment. Dkt 24,. ¶ 12.) Defendants offered Plaintiffs an 8 month repayment plan in a letter dated April 1, 2014. (Dkt 24, ¶ 12; Ex. H.) The proposed monthly repayment amount was $2,767.63, with the portion of the payment in excess of the regular principal and interest payment to be first placed in a suspense account. *Id.*

Plaintiffs rejected the Repayment Plan, sending an appeal letter dated April 9, 2014, indicating they had incurred additional expenses that they did not believe were accounted for in the offer. (Dkt 24, ¶ 13, Exh. I.). Defendants evaluated the Plaintiffs' appeal and determined that the Plaintiffs' income and expense situation had been evaluated appropriately. *Id.*, ¶ 14. As a result, DMI sent the Plaintiffs a letter dated April 24, 2014, denying the appeal. *Id.*, Ex. J.

With regard to this Second Loss Mitigation Application, no dispute can exist that the Defendants complied with 12 C.F.R. § 1024.41. The facts show the Plaintiffs' dissatisfaction with the loss mitigation option offered to them, which does not constitute a violation of RESPA.

**D.     Bank2 and DMI Complied with RESPA in the Handling of the Plaintiffs' First Loss Mitigation Application**

Plaintiffs applied for loss mitigation again on June 6, 2014. (Dkt 24, ¶ 15.) DMI acknowledged receipt of that application, analyzed the documents and information submitted, and identified additional financial information and documents needed to complete the application. *Id.* The June 12, 2014, acknowledgment letter, and June 30, 2014, and July 10, 2014, missing documents letters are attached to DMI's declaration as Exhibits K, L, and M, respectively. When Plaintiffs did not respond or provide the missing documents, DMI sent the Plaintiffs a letter dated July 23, 2014, advising they failed to provide all the documents required for consideration of loss mitigation retention options. (Dkt 24, ¶ 16, Ex. N.)

MEMO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY                    Page 12
JUDGMENT

DMI received additional documents from Plaintiffs on July 28, 2014, apparently seeking to supply missing information from their June 6, 2014, loss mitigation application. (Dkt 24, ¶ 17.) Defendants treated the late submission as a new loss mitigation application by utilizing the information submitted by Plaintiffs starting on June 6, 2014, and through July 28, 2014. *Id.* DMI acknowledged the application by a letter to the Plaintiffs dated August 5, 2014, and then acknowledged a complete application by letter dated August 11, 2014. (*Id.*, Exs. O, P.)

After considering the financial information, Defendants determined that the Plaintiffs did not qualify for a loan repayment plan based upon the excess of expenses over income. (Dkt 25, ¶ 4; Docket 24, ¶ 18.) DMI sent a letter to Plaintiffs dated September 9, 2014, advising that their request for loss mitigation was denied.  (Docket 24, ¶ 18, Ex. Q.)

As to the Third Loss Mitigation Application, no dispute exists that the Defendants timely acknowledged receipt of a loss mitigation application, advised in writing of missing documents, and timely notified Plaintiffs that they did not qualify for any available loss mitigation alternative. As a result, Plaintiffs cannot establish a violation of 12 C.F.R. § 1024.41.

### E.  Plaintiffs Do Not Identify Any Qualified Written Request or Notice of Error to Which Bank2 or DMI Failed to Respond

Plaintiffs recite the text of 12 C.F.R. § 1024.35(e) in paragraph 37 of their SAC and claim that Defendants "failed to substantively respond to Plaintiffs' Qualified Written Request/Notice of Error" in paragraph 38. The undisputed facts show that Plaintiffs do not allege they sent a QWR or Notice on any particular date, do not attach the purported letter, and do not identify the alleged deficiency in the response received. Further, none of the documents produced by Plaintiffs in response to discovery or as part of Initial Disclosures include such a letter.

To the extent the Plaintiffs contend the April 9, 2014, appeal of the Repayment Plan offer constitutes a Notice of Error – which Defendants dispute because the more specific provisions of

12 C.F.R. § 1024.41 govern – Defendants considered that appeal and provided a written denial dated April 24, 2014. Federal law does not require the Defendants to provide a complete explanation of all of their underwriting considerations when issuing a denial, and no genuine dispute can exist regarding the sufficiency of Defendants' April 24, 2014, response letter. As a result, the April 9, 2014, appeal cannot form the basis for a claim under 12 C.F.R. § 1024.35(e).

Plaintiffs may claim that letters sent in August of 2014 constitute communications within the meaning of 1024.35(e). If so, this argument fails for two reasons. First, Plaintiffs sent that correspondence in connection with a pending loss mitigation application, and the more specific provisions of 12 C.F.R. § 1024.41 govern over 12 C.F.R. § 1024.35(e) regarding the Defendants' response. Second, Defendants completely responded because the Plaintiffs simultaneously applied for loss mitigation, and the amount Plaintiffs offered to pay was only half of the arrears. The undisputed facts show that Plaintiffs could not cure the remainder of the default because their expenses exceeded their income at the time of that correspondence. Since Defendants evaluated Plaintiffs for loss mitigation in compliance with the HUD Section 184 Guidelines, they therefore satisfied their obligations to respond by sending the letter to Plaintiffs dated September 19, 2014.

### F.  Conclusion – No Violation of RESPA Can be Established

The undisputed facts show that the Defendants appropriately handled each of the loss mitigation applications, including the appeal of the Repayment Plan offered to the Plaintiffs. RESPA does not make this Court into a loss mitigation appellate review panel that can reach a different decision on the applications submitted, as discussed in more detail in Section V. *infra*. Further, Defendants did not fail to address some Notice of Error or QWR. Consequently, summary judgment on the RESPA cause of action should be granted to Defendants.

**IV.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE
DECLARATORY JUDGMENT CLAIM BECAUSE BANK2 HIS MET THE
DEFINITION OF A BENEFICIARY UNDER OREGON LAW AT ALL TIMES**

Plaintiffs' theory that Bank2 does not meet the definition of a beneficiary fails as a matter

of fact and law. At paragraph 47 of the SAC, Plaintiffs seek a declaration that neither defendant

is "in fact the beneficiary of the Note and the actual beneficiary as defined under ORS 86.735,

that the actual beneficiary of the Note has not been made known to the Plaintiffs and therefore

the Defendants cannot conduct a nonjudicial foreclosure sale on this property". The evidence

establishes that: Bank2 at all times owned the loan at issue; Bank2 issued a mortgaged backed-

security guaranteed by GNMA that included the subject loan as one of the loans in the pool; and,

MERS authorized Bank2 employees as limited signing officers with the specific written

authority to assign the deed of trust to Bank2. Further, the evidence, statutory authority, and case

law leave no doubt that Bank2 owns the loan at issue. While GNMA guarantees payment to

security holders, it is only entitled to an assignment of the loans in the securitized pool if Bank2,

as Issuer of the security, defaults on its obligations under the GNMA MBS Guides. As a result,

Plaintiffs' Declaratory Judgment claim has not factual or legal basis.

The legal and factual arguments supporting Defendants' entitlement to summary

judgment on this cause of action have been set forth in their Opposition to Plaintiffs' Motion for

Partial Summary Judgment (Dkt 75) and their Supplemental Opposition (Dkt 97). Therefore,

Defendants incorporate those arguments with specific references to those briefs as noted below.

**A.    Legal Authority Governing Declaratory Judgment Claims**

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court "may declare the

rights and other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought." 28 U.S.C. § 2201(a). "[D]eclaratory judgments are designed

to declare rights so that parties can conform their conduct to avoid future litigation," and are untimely if the questionable conduct has already occurred or damages have already accrued. *See The Hipage Co., Inc.*, 589 F.Supp.2d 602, 615 (E.D.VA. 2008). If a complaint seeks to redress past alleged wrongs in connection with authority to foreclose on the property, not prospective wrongdoing, it fails to state an independent claim for declaratory relief. *Flores v. EMC Mortgage Co.*, 997 F. Supp. 2d 1088, 1111-12 (E.D. Cal. 2014).

**B.    The Nonjudicial Foreclosure Process Is Valid because Bank2 Meets the Definition of a Beneficiary and Because MERS Can Assign the Deed of Trust**

Plaintiffs argue that Bank2 is not the true beneficiary under Oregon law, and that MERS had no authority to execute an assignment of the deed of trust. The undisputed facts and authority show these contentions are simply erroneous. As set forth in Defendants' Opposition at Docket 75, Section III.A.1, pp. 7-8, the undisputed facts establish that Bank2 meets the definition of a beneficiary under Oregon Deed of trust Act as the lender to whom the obligation that secures the deed of trust is owed. Further, as discussed at Docket 75, Section III.A.2, pp. 8-10, MERS had the authority as agent for Bank2 to assign the deed of trust to Bank2. Plaintiffs misinterpret the recent in *Fed. Nat. Mortgage Ass'n v. Goodrich*, 275 Or. App. 77 __ P.3d __ (2015), as that court specifically found that MERS can act as an agent for the beneficiary when it can demonstrate that relationship and the agreement is sufficiently expansive. 275 Or. App. 77, 2015 WL 7968079, *6. The undisputed evidence shows that MERS had written authority to assign the beneficial interest under the Deed of Trust to Bank2. Consequently, the challenge to the sufficiency of the nonjudicial foreclosure process based on this assignment of the deed of trust to Bank2 has no factual or legal support.

**C.    Plaintiffs' Misunderstanding of the GNMA MBS Loan Guarantee Program Does Not Change the Fact that Bank2 Has Met the Definition of a Beneficiary under Oregon Law at all Times**

Plaintiffs' theorize that GNMA actually owns the loan at issue based upon their misapprehension of the structure and function of GNMA mortgage-backed securities. As discussed in detail at Docket 75, Section III.B, pp. 10-11, the assertion that GNMA actually owns the loan flies in the face of common sense. No dispute exists that: GNMA did not underwrite the loan; GNMA did not originate the loan; GNMA did not sell the mortgage-backed security at issue; GNMA did not receive any of the proceeds from the sale of the securities by Bank2; GNMA is paid a commitment fee by Bank2 based upon the total amount of securities it agrees Bank2 can issue under the GNMA guaranty program; GNMA is paid a monthly guaranty fee by Bank2; and, GNMA only pays the holders of the securities sold by Bank2 if Bank2 fails to make the payment. In essence, the Plaintiffs want the Court to believe that GNMA becomes the owner of a loan even though it does not pay anything for it, but actually receives fees for every month that the loan exists, whether or not the borrowers make payments. Factually, this is too good to be true; legally, it fails.

The following sections discuss the statutory authority for the guaranty program, the GNMA Guides that specifically set forth the obligations of securities issuers like Bank2, the forms that comprise the contractual obligations of Bank2 and GNMA, and cases explicitly finding that GNMA has a security interest in the loans of the securitized pools, not ownership.

### 1.    Statutory Basis for the MBS Guarantee.

Defendants incorporate their argument from Docket 75, Section III.B.1, p.1, establishing that the GNMA guarantee program is created by Federal statute.

**2.    The GNMA MBS Guide Provisions Make Clear that the Issuer of the Mortgage Backed-Securities Maintains Ownership of the Loans in the Pool subject to the Security Interest of GNMA.**

Defendants incorporate their argument from Docket 75, Section III.B.2, p. 12, discussing the multiple provisions from the GNMA MBS Guide that govern its contractual relationship with issuers of the mortgage backed securities. The undisputed facts and the GNMA MBS Guides establish that Bank2 owns the loan with GNMA guaranteeing payments to security holders.

**3.    The Flow of Money Under the Securitization Transaction Shows that Bank2 is the Owner of the Loan**

A common sense analysis of how the payments flow under the securitization shows that GNMA only has a conditional guaranty obligation, not an ownership interest. Bank2 issued securities for sale to the public and received cash in exchange. (Nate Atchison Declaration, Dkt 98, ¶ 5). Since the securitization, Bank2 has been required to make funds available on a monthly basis for distribution to security holders. *Id*. at ¶ 6. Bank2 transfers funds each month into a custodial account at Bank2 held in trust for the benefit of the GNMA-backed security holders. Bank2 makes the payment required even if the borrowers on the underlying loans do not make their payments to Bank2. *Id*. Each month, the Bank of New York, as administrator and trustee for the GNMA-backed security program, drafts the full amount from that account in order to make the payment to the security holders. *Id*.

Since the securitization of this loan in 2010, Bank2 has made required monthly guaranty fee payments to GNMA in order to maintain the guaranty of payments to security holders. Dkt 98, ¶ 7. Bank2 makes the monthly guarantee payment to the same Bank of New York administered custodial account for payments to security holders. *Id*.

GNMA accounts for its interest in mortgage-backed securitizations as a guaranty, not as ownership of the loans comprising the security. The 2015 GNMA Annual Report contains the

discussion of its business operations, the Management Discussion and Analysis, the Audit Report of the Office of Inspector General, and GNMA's financial statements. The Annual Report establishes that GNMA accounts for securitizations like the one at issue as a Guarantee Asset and Liability, not as loans it claims to own. Defendants incorporate their argument from the Supplement to the Opposition to Plaintiffs' Motion for Partial Summary Judgment, Docket 97, Section II, pp. 2-4, regarding GNMA's accounting for mortgage-backed securities it guarantees.

Finally, no dispute exists that GNMA has no role in the loss mitigation process for the loan at issue. As discussed in Section V. below, HUD Section 184 Guidelines apply to the servicing of this loan. Consequently, the money flow for the securitization transaction confirms that Bank2 is the beneficiary of the loan under Oregon law.

### 4.    GNMA Required Forms Establish that GNMA Guarantees Payments to Security Holders and Has a Security Interest in the Loans that Back Each Security.

Defendants incorporate their argument from Docket 75, Section III.B.3, pp.16-17, that the securitization documents produced in discovery are consistent with the MBS Guide and the principle that Bank2 maintains ownership of the loan while GNMA has a guaranty obligation that arises only if Bank2 defaults in its obligations.

### 5.    Courts Have Found GNMA Has a Security Interest Only in Loans Pooled as Collateral for the Guaranteed Securities.

Defendants incorporate their argument from Docket 75, Section, III.B.4, pp. 17-19, that the decisions addressing the GNMA MBS program relative to ownership of the loans conclude that GNMA only acquires ownership of loans in a securitization upon the default by the Issuer in its performance under the MBS Guides.

MEMO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY                    Page 19
JUDGMENT

All of the foregoing establishes that GNMA is not the owner of the loan at issue, but instead a guarantor of payments to security holders. Therefore, Defendants are entitled to summary judgment on Plaintiffs' Declaratory Judgment claim.

**V.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' BREACH OF CONTRACT AND BREACH OF THE COVENANT OF GOOD FAITHA ND FAIR DEALING CAUSES OF ACTION BECAUSE DEFENDANTS COMPLIED WITH THE HUD SECTION 184 GUIDELINES APPLICABLE TO THE SERVICING OF THE LOAN AT ISSUE**

Plaintiffs' claims for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing rest entirely on their attempts to modify their loan after their June 2013 default. Both claims fail for two reasons. First, Plaintiffs never tendered, and Defendants never rejected, any payment after June 2013. Instead, the undisputed facts show the Plaintiffs did not have the funds to make the partial payments they claim to have offered. Second, Defendants properly serviced the loan under HUD Section 184 Guidelines, and Plaintiffs' refusal of a repayment plan in hopes of getting better terms does not violate 12 C.F.R. § 1024.41(a).

**A.      Defendants Complied with the Applicable Servicing Guidelines**

No dispute exists that the HUD Section 184 Guidelines apply to the servicing of the loan. These Guidelines make clear that defendants have no obligation to offer the Plaintiffs a loan modification or any other specific loss mitigation option. Specifically, HUD Notice PIH-2014-11, issued May 9, 2014, specifies at Guideline 7 that "the Section 184 program does not require servicers or the owner of a mortgage loan to offer any specific loss mitigation option." (Defendants' Request for Judicial Notice, Exh. A, document D000010). Under the Guidelines effective on May 9, 2014, whether to offer a loan modification "is to be made solely by the servicer". *Id*. at D000017.

The HUD Section 184 Guidelines in effect prior to May 9, 2014, similarly did not require Defendants to offer a loan modification. Chapter 8-6 g. specified that the "lender <u>may</u> evaluate

the borrower's ability to enter into a loan modification plan to cure the loan default. <u>The Program</u> <u>ONAP must approve any loan modification</u>." *Id.* at D000046, emphasis added. In contrast, Chapter 8-6 h. specifies that a lender "<u>must</u> evaluate whether the borrower has the capability to reinstate the mortgage and <u>must</u> discuss the possibility of a repayment plan with the borrower." *Id.* at D000046, emphasis added.

Further, the Section 184 Guidelines in effect prior to May 9, 2014, addressed when a lender could accept or reject a partial payment <u>actually tendered</u> by a borrower. *Id.* at D000041. The Guidelines effective at the time did not require a lender to affirmatively accept an oral offer to tender less than the full amount due to reinstate a loan; as discussed in Section V.B below, Plaintiffs admit that they never actually attempted to make a partial payment and did not have the funds to make a partial payment at the time of the alleged offers.

Bank2 specifically inquired of the Office of Native American Programs (ONAP) within HUD whether it would approve a loan modification if Bank2 determined that Plaintiffs qualified for such a loss mitigation alternative. The director of ONAP advised Gene Watson of Bank2 that it "will not approve any modification of the loan." (Watson Depo, p. 43:13-25, 44:1-2, Exh. C to excerpts attached to the concurrently filed Declaration of Peter J. Salmon.)

**B.    <u>No Breach of Contract Occurred Because Plaintiffs Never Tendered Any</u>** **<u>Partial Amount Due and Were Not Required to Accept the Plaintiffs' Proposed Repayment</u>** **<u>Plan Terms</u>**

Plaintiffs claim that Defendants rejected a verbal offer to make a single payment on July 1, 2013, when they had missed their June 2013 monthly payment, and then rejected a verbal offer in September of 2013 to make the June and July 2013 monthly payments. (SAC ¶ 45). These assertions are completely contradicted by the facts obtained during discovery. Plaintiffs then generally allege that Defendants materially breached their obligations under the contract

based on the conduct alleged in paragraphs 7 through 44. These incorporated allegations essentially relate to the loss mitigation servicing discussed in Section III. above. As discussed below, none of these theories are supported by facts, making summary judgment appropriate.

       **1.**      **The Oral Offers to Tender Partial Payments are Unsupported by the Facts and Cannot Form the Basis of a Breach of Contract Claim**

Plaintiffs admit that they missed their June 2013 monthly mortgage payment. (SAC, ¶ 12). They also admit that, contrary to their allegation in paragraph 12 of the SAC that they had a "full payment for June of July 1st", they did not have the money to make that June 2013 payment when they allegedly offered to on July 1, 2013. (Iron Hawk Depo., p. 19:14-25, Exh. A to Salmon Decl.) Specifically, Candace Iron Hawk admitted she did not have sufficient funds in any of her bank accounts to make the payment on July 1, 2013. (Iron Hawk Depo., 27:8:16). Instead, Plaintiffs planned to borrow money from a relative and use $250 in previously undisclosed cash for a side business of selling pallets. *Id*., pp. 19:7-13, 20:5-10. Plaintiffs did not tender a payment that Defendants rejected. *Id*. at p. 19:22-25.

DMI's loan servicing notes show that Defendants did not reject any verbal offer by Plaintiffs to make a single payment on July 1, 2013, or any other date. (Dkt 53, Exh. C, documents D000667-D000669). Candace Iron Hawk did not keep notes of her conversations with Defendants, does not recall when she spoke with representatives of DMI or Bank2, and does not recall the names of persons at DMI or Bank2 with whom she claims to have spoken about this default in payments. (Iron Hawk Depo, 10:21-25, 11:1-22, Exh. A to Salmon Decl.)

DMI's loan servicing notes show that on September 7, 2013, DMI told Plaintiffs that they needed to "come up with 2 pmnts prior to EOM" (Docket 53, Exh. C). This meant two payments would be accepted even though the loan was contractually due for the June, July, August, and

September 2013 monthly payments. Therefore, the Defendants favorably responded to Plaintiffs' proposal to pay less than the full amount due to reinstate the loan.

In addition, Plaintiffs never actually tendered a partial payment to Defendants – they only allege oral "offers" to do so. Further, Plaintiffs' bank statements for the period from June 27, 2013, through September 27, 2013, submitted with their First Loss Mitigation Application, showed that they either were overdrawn each banking period, or had a maximum of $157.38 as an ending balance. (Salmon Decl., Exh. B, documents D000505-D000524, D000568-D000576, D000442-D000446.) Their deposition testimony shows they needed to borrow money to proffer even less than the full amount due on the loan. As a result, Plaintiffs cannot show they had the ability to perform their contractual obligations.

Plaintiffs also cannot show that Defendants breached the HUD Section 184 Guidelines in connection with the oral proposal to pay less than the full amount due on the loan. Even if the Court disregards the Plaintiffs' inability to tender the amount allegedly offered in the period from July of 2013 through September of 2013, neither the loan documents nor the HUD Section 184 Guidelines required Bank2 to accept less than the full amount due for a loan in default. *See* discussion in Section V. A *supra*. Further, Defendants advised Plaintiffs they could tender two of the four monthly payments due in September of 2013. As a result, no factual or legal basis exists to support Plaintiffs' breach of contract claim, making summary judgment warranted.

## 2.    The Rejection of a 20 Month Repayment Plan Does Not Breach HUD Section 184 Guidelines or the Underlying Contract

Plaintiffs' contention that Defendants breached the contact by not accepting a 20 month repayment plan proposal in August of 2014 is similarly flawed. Plaintiffs submitted a complete loss mitigation application to Defendants as of July 28, 2014. Bank2 determined that Plaintiffs did not qualify for a loan repayment plan because their expenses exceeded their income. (Dkt 24,

¶ 18 and Exh. Q.) Plaintiffs' offer to tender $7,000 from an insurance settlement did not change the repayment plan calculation because it was less than half of the loan default amount and Plaintiffs' monthly expenses still exceeded their monthly income.

Consequently, Defendants responsibly evaluated Plaintiffs' ability to repay and reached an appropriate conclusion on Plaintiffs' 20 month repayment proposal. Plaintiffs essentially request that the Court substitute its judgment for that of Defendants regarding loss mitigation. This cannot form the basis of a breach of contract claim, warranting summary judgment.

**C.    No Breach of the Covenant of Good Faith and Fair Dealing Exists Because Defendants Complied with the HUD Section 184 Guidelines, and Plaintiffs Rejected the Loan Repayment Plan Offered to Them**

Plaintiffs allege breach of the covenant of good faith and fair dealing "in the manner described in paragraphs 7 through 45." (SAC ¶ 50). Oregon law recognizes an implied covenant that contracting parties will refrain from any act that would "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract [.]" *Iron Horse Eng'g Co. v. Nw. Rubber Extruders, Inc.*, 193 Or. App. 402, 421 (2004). The implied covenant requires the parties "to facilitate performance and enforcement of the contract when it is consistent with and in furtherance of the agreed-upon terms of the contract, or where it effectuates the parties' objectively reasonable expectations under the contract[.]"*Morrow v. Red Shield Ins. Co.*, 212 Or.App. 653, 661-62 (2007).

The arguments in Section III *supra* regarding RESPA, and Section V.B regarding breach of contract, establish that no breach of the implied covenant of good faith and fair dealing occurred. Defendants appropriately considered Plaintiffs' loss mitigation applications and serviced the loan pursuant to HUD Section 184 Guidelines. Therefore, summary judgment in favor of Defendants on this cause of action is warranted.

## VI.    SUMMARY JUDGMENT IS WARRANTED ON THE OUTPA CLAIM

Plaintiffs' claim for violation of the OUTPA rests on two contentions: Defendants lack any financial incentive to provide loss mitigation to homeowners (SAC ¶ 55); and, Defendants induced them to believe there were no workable loss mitigation programs available (SAC ¶ 56). Plaintiffs claim this conduct violated ORS §§ 646.605, 645.607 and 645.608.

Plaintiffs' claim under ORS § 646.607 fails because only the State of Oregon may pursue such claims; Oregon law "does not create a private right of action for violations of ORS 646.607." *Norton v. Nelson*, 252 Or.App. 611, 619–20 (2012). Further, ORS § 646.605 sets forth definitions applicable to other portions of the OUTPA. Therefore, only ORS § 646.608 could possibly provide bases for this cause of action, and Plaintiffs cannot satisfy either the legal standard or factual showing required to overcome summary judgment.

### A.    Legal Standard for a claim of Violation of the OUTPA

OUTPA allows a private right of action for persons who have suffered an "ascertainable loss of money or property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608." A "causal link between the plaintiff's loss and the defendant's actions must exist to state a viable UTPA claim." *Fleshman v. Wells Fargo Bank, N.A.*, 27 F. Supp. 3d 1127, 1140 (D. Or. 2014). "A willful violation occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." O.R.S. 646.605(10). *See also Fleshman, supra,* 27 F. Supp. 3d at 1141.

To the extent that Plaintiffs' tie their claims to alleged violation of ORS 646.608, they must "connect these allegations to a particular subsection of the statute." *Fleshman*, 27 F. Supp. 3d at 1140. Similarly, Plaintiffs must plead causation "in sufficient detail to put Defendant on

notice of the casual relationship between a particular alleged unfair business practice and the ascertainable loss and damages incurred as a result of that particular conduct." *Id*. at 1141.

      **B.**    **Plaintiffs' Theory that Defendants Have No Financial Incentive to Pursue Loss Mitigation is Contrary to the Undisputed Facts**

Plaintiffs correctly note that private lenders like Bank2 who make loans under the HUD Section 184 loan program receive a HUD guarantee. The guarantee is a private contract between Bank2 and HUD under which Bank2 may make a claim if it does not receive payment in full on the loan through borrower payments or through foreclosure of the real property. Plaintiffs claim this guarantee eliminates the incentive for Bank2 to reach a workout options with them.

Plaintiffs' theory is meritless in the face of the evidence. As discussed in detail in Section IV *supra*, Bank2 has to make monthly payments to security holders even when borrowers do not make payments, like the Plaintiffs in this case. In addition, Bank2 must continue to pay the real property taxes due and keep the structure insured. Therefore, Bank2 has a strong financial incentive to have performing loans that do not cause a monthly loss, not to keep loans in default in the hopes of being partially or fully reimbursed in the future. As a result, Plaintiffs' theory rests on hyperbole rather than fact, warranting summary judgment.

      **C.**    **Plaintiffs Cannot Meet the Legal Standard for the Other Elements of an OUTPA Cause of Action**

"A willful violation [of OUTPA] occurs when the person committing the violation knew or should have known that the conduct of the person was a violation." O.R.S. 646.605(10). To the extent that Plaintiffs' allege a violation of ORS 646.608, they must "connect these allegations to a particular subsection of the statute." *Fleshman*, 27 F. Supp. 3d at 1140. Similarly, Plaintiffs must plead causation "in sufficient detail to put Defendant on notice of the casual relationship

between a particular alleged unfair business practice and the ascertainable loss and damages incurred as a result of that particular conduct." *Id*. at 1141.

Plaintiffs cannot prove that Defendants knew or should have known their conduct violated the OUTPA because Defendants serviced the loan consistent with HUD Section 184 loss mitigation guidelines. Further, Plaintiffs do not even attempt to tie their claims to particular subsection of ORS § 646.608 despite having filed an original, first amended, and second amended complaint. Finally, Plaintiffs cannot meet the OUTPA causation standard because they did not have the ability to cure the loan default. Consequently, summary judgment must be granted to Defendants on the OUTPA claim.

### VII.    <u>CONCLUSION</u>

The undisputed facts establish that Plaintiffs cannot prove any of their causes of action against Defendants. As a result, the Court should grant summary judgment in favor of both Bank2 and DMI.

Dated:  April 8, 2016                      ALDRIDGE PITE, LLP


By:    /s/ Peter J. Salmon
          PETER J. SALMON, OSB No. 141860
          TRACY J. FRAZIER, OSB No. 107125
          Attorneys for Defendants Bank2 and
          Dovenmuehle Mortgage, Inc.