IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CANDACE IRON HAWK and ROBERT VAN
PELT,

                Plaintiffs,

                                                 3:15-CV-1374-PK

v.                                                   FINDINGS AND
                                                   RECOMMENDATION

BANK2 and DOVENMUEHLE MORTGAGE,
INC.,

                Defendants.

PAPAK, Magistrate Judge:

      Plaintiffs Candace Iron Hawk and Robert Van Pelt filed this action against defendants

Bank2 and Dovenmuehle Mortgage, Inc. ("Dovenmuehle"), on July 22, 2015.  Plaintiffs amended

their complaint effective October 15, 2015, and again effective December 16, 2015.  By and

through their second amended complaint, plaintiffs allege that Bank2 is a bank specializing in

mortgage lending to Native Americans, specifically in United States Department of Housing and

Page 1 - FINDINGS AND RECOMMENDATION

Urban Development Section 184 Indian Home Loan Guarantee Program loans to Native

Americans, and that Dovenmuehle is a subservicer of portfolio mortgages for Bank2. Plaintiffs

further allege that in February 2010, they received a 30-year Section 184 mortgage loan on their

Multnomah County residence from Bank2, with Dovenmuehle acting as the subservicer of the

loan. Plaintiffs further allege that after Van Pelt was injured in a car accident, they experienced

financial difficulties, with the consequence that they failed to make an approximately $1,100

monthly payment on the loan that was due and owing as of the beginning of June 2013.

Plaintiffs further allege that they subsequently offered to make up the missed payment on at least

three occasions, only for their offers to be refused on the grounds that defendants would not

accept any payments until all payments were brought current, and that defendants refused to

negotiate a loan modification with them in violation of the provisions of Section 184

notwithstanding plaintiffs' efforts to initiate such negotiations. Plaintiffs further allege that in

March 2015, Bank2 issued a Trustee's Notice of Sale by and through which it sought to sell

plaintiffs' residence via a non-judicial foreclosure. Arising out of the foregoing, plaintiffs allege

defendants' liability for the violation of the Real Estate Settlement Procedures Act ("RESPA"),

12 U.S.C. § 2605(f), by failing to respond as required to plaintiffs' loss mitigation (loan

modification) application, for breach of contract under Oregon common law by failing to accept

plaintiffs' tendered late payments, for breach of the implied covenant of good faith and fair

dealing under Oregon common law by failing to negotiate modification of the mortgage and

failing to accept plaintiffs' tendered payments, and for violation of Oregon's Unfair Trade

Practices Act ("UTPA"), Or. Rev. Stat. § 646.605 *et seq.*, by failing to negotiate modification of

the mortgage, and in addition seek this court's declarations that neither defendant is a beneficiary

of the note securing the mortgage on plaintiffs' residence and that the defendants may not proceed

with a non-judicial foreclosure on plaintiffs' residence, as well as injunctive relief to enjoin any

such non-judicial foreclosure.  Plaintiffs seek monetary damages in the amount of $170,000,

emotional distress damages in the amount of $250,000, award of their fees and costs, and the

declarative and injunctive relief discussed above.  This court has federal question jurisdiction

over plaintiffs' RESPA claim and declaratory judgment claim pursuant to 28 U.S.C. § 1331, and

may properly exercise supplemental jurisdiction over plaintiffs' state-law claims pursuant to 28

U.S.C. § 1367; in addition, this court may properly exercise diversity jurisdiction over plaintiffs'

action pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the

amount in controversy.

On September 29, 2015, Judge Simon entered a temporary restraining order to enjoin

defendants from proceeding with the noticed foreclosure of plaintiffs' residence until October 12,

2015.  On October 5, 2015, Judge Simon extended the TRO until October 23, 2015.  On October

21, 2015, pursuant to defendants' stipulation, Judge Simon extended the TRO a second time,

until October 29, 2015.  On October 29, 2015, Judge Simon entered a preliminary injunction

enjoining defendants from foreclosing on plaintiffs' residence during the pendency of these

proceedings.

On December 14, 2015, plaintiffs filed a motion for partial summary judgment; that

motion is currently before the court.  On January 7, 2016, in support of their opposition to

plaintiffs' partial dispositive motion, defendants requested that the court take judicial notice of

certain documents promulgated by the Government National Mortgage Association ("GNMA" or

"Ginnie Mae").  On January 27, 2016, in connection with their reply memorandum in support of

their motion, plaintiffs offered, among other materials, the Declaration of Bernard J. Patterson

("Patterson Decl."), a forensic accountant not previously disclosed to defendants as an expert

witness; defendants promptly moved to strike Patterson's declaration testimony on January 28,

2016. Oral argument was held in connection with plaintiffs' partial summary judgment motion,

defendants' request for judicial notice, and defendants' motion to strike the Patterson declaration

on February 2, 2016.

At oral argument, I granted defendants' request for judicial notice of January 7, 2016, and

additionally granted defendants leave to file supplemental briefing in support of their opposition

to plaintiffs' partial dispositive motion by not later than February 18, 2016. On February 18,

2016, defendants filed supplemental briefing in support of their opposition, and in addition filed

a second request for judicial notice of GNMA-promulgated documents.

Now before the court are (i) plaintiffs' motion (#66) for partial summary judgment as to

their claim for this court's declaration that defendant Bank2 is not the beneficiary of plaintiffs'

mortgage loan and for this court's declaration that the defendants herein may not lawfully

proceed with a non-judicial foreclosure on plaintiffs' residence, (ii) defendants' motion (#89) to

strike the Patterson declaration, and (iii) defendants' request (#99) for judicial notice filed

February 18, 2016. I have considered the motions, oral argument on behalf of the parties, and all

of the pleadings and papers on file. For the reasons set forth below, defendants' motion (#89) to

strike should be denied, defendants' request (#99) for judicial notice should be granted, plaintiffs'

motion (#66) for partial summary judgment should be granted, and this court should declare both

that defendant Bank2 is not the beneficiary of plaintiffs' mortgage loan and that the defendants

herein may not lawfully proceed with a non-judicial foreclosure on plaintiffs' residence.

## LEGAL STANDARDS

### I.      Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## II.    Request for Judicial Notice

Federal Rule of Evidence 201(d) provides that "[a] court shall take judicial notice [of an adjudicative fact] if requested by a party and supplied with the necessary information." An adjudicative fact is subject to judicial notice when the fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).

## III.    Motion to Strike

### A.    Federal Civil Procedure Rule 12(f)

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" on their own initiative or pursuant to a party's motion. Fed. R. Civ. P. 12(f). The disposition of a motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Für Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

### B.    Inherent Power

It is well established that the district courts enjoy an inherent power to manage and control their own dockets. *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (affirming "the power inherent in every court to control the disposition of the causes on its docket with

economy of time and effort for itself, for counsel, and for litigants"). It is clear that this inherent

power includes the authority to sanction procedural impropriety in an appropriate manner. *See,*

*e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (noting that "[a] primary aspect" of

the courts' inherent power "is the ability to fashion an appropriate sanction for conduct which

abuses the judicial process;" holding that because "outright dismissal of a lawsuit . . . is within

the court's discretion," in consequence less severe sanctions are "undoubtedly within a court's

inherent power as well"); *Atchison, T. & S.F. Ry. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir.

1998) ("well established that district courts have inherent power to control their dockets and may

impose sanctions, including dismissal, in the exercise of that discretion") (citations, internal

quotation marks omitted); *see also Lamos v. Astrue*, 2008 U.S. App. LEXIS 9143 (9th Cir. 2008)

(unpublished disposition) (affirming inherent power of the courts to strike documents other than

pleadings from the docket); *Centillium Communs., Inc. v. Atl. Mut. Ins. Co.*, 2008 U.S. Dist.

LEXIS 20719 (D. Cal. 2008) (striking a procedurally improper motion pursuant to the court's

inherent power).

## JUDICIAL NOTICE

As noted above, defendants previously requested that this court take judicial notice of

certain statements made by GNMA on its website and of certain chapters of the Ginnie Mae

Handbook 5500.3 (the GNMA "Guide"), specifically Chapters 1, 9, 15, 16, 18, and 23 thereof.

Also as noted above, at oral argument in connection with the motions now pending, I granted that

request. The judicially noticed information includes the following relevant statement by GNMA

regarding its business model:

Ginnie Mae's business model significantly limits U.S. taxpayers' exposure to risk

associated with secondary market transactions. Its strategy is to guarantee a simple pass-through security to investors rather than buy loans and issue its own securities. Because private lending institutions originate eligible loans, pool them into securities and issue Ginnie Mae MBS [*i.e.*, mortgage-backed securities], the corporation's exposure to risk is limited to the ability and capacity of its MBS Issuer partners to fulfill their obligations to pay investors. By guaranteeing the servicing performance of the Issuer – not the underlying collateral – Ginnie Mae insulates itself from the credit risk of the mortgage loans.

"Ginnie Mae's Role in Housing Finance." Ginnie Mae Consumer Education (Apr. 25, 2016),

http://www.ginniemae.gov/consumer_education/Pages/ginnie_maes_role_in_housing_

finance.aspx. In addition, the noticed chapters of the Guide include the following further

statement regarding Ginnie Mae's business model:

The Government National Mortgage Association (Ginnie Mae), through its Mortgage-Backed Securities (MBS) Programs, guarantees securities that are backed by pools of mortgages and issued by mortgage lenders (Issuers) approved by Ginnie Mae. Security holders receive a "pass-through" of the principal and interest payments on a pool of mortgages, less amounts required to cover servicing costs and Ginnie Mae guaranty fees. The Ginnie Mae guaranty ensures that the security holder receives the timely payment of scheduled monthly principal and any unscheduled recoveries of principal on the underlying mortgages, plus interest at the rate provided for in the securities. If a borrower fails to make a timely payment on a mortgage, the Issuer must use its own funds to ensure that the security holders receive timely payment. If an Issuer fails to ensure that the funds necessary to make timely payment are available or otherwise defaults in the discharge of its responsibilities, Ginnie Mae, in accordance with its guaranty, will make payments to security holders.

Guide, Ch. 1-1. Chapter 1 of the Guide also establishes that, following submission of mortgages

to a loan pool, and thereafter "[f]or the life of the pool or loan package, the Issuer is responsible

for servicing the [pooled] mortgages, administering the securities, and submitting periodic

reports to Ginnie Mae. . . ." Guide, Ch. 1-11(C). Issuers must meet the eligibility requirements

provided in Chapter 2 of the Guide to be approved by GNMA to issue securities backed by

pooled mortgages. *See* Guide, Ch. 2.

Page 8 - FINDINGS AND RECOMMENDATION

Chapter 15 of the Guide "addresses an issuer's monthly obligation . . . to pay security holders [*i.e.*, holders of the securitized pooled mortgages] [and/or] to . . . make available [to such security holders] . . . funds in the amount of the monthly payment due on such securities." Guide, Ch. 15-1. The issuer is specifically required to make such payments or make such funds available for payment to the security holders in the amount of borrowers' "monthly payments of principal and interest" less GNMA's guaranty fees and the issuer's servicing fee, Guide, Ch. 15-2, 15-3, *see also* Guide, Ch. 1-1, 15-4, and moreover is obligated to make such "payments and deposits without regard to whether [it] will be able to recover those payments from liquidation proceeds, insurance proceeds, or late payments" from the borrowers. Guide, Ch. 15-2, 15-3. The issuer is not entitled to retain funds that cannot be delivered to security holders, and in the event the issuer is ultimately unable to deliver such payments to security holders for a six month period, they must be remitted to GNMA. *See* Guide Ch. 15-2(C). Moreover, the issuer is not entitled to withdraw funds representing borrowers' principal and interest payments on the underlying mortgages from the account it has set up to hold such funds; withdrawals of such funds from such accounts must be made by the entity responsible for disbursing such funds directly to the security holders. *See* Guide, Ch. 16-4.

Pursuant to Chapter 18 of the Guide, issuers are obliged to continue servicing pooled mortgage loans after borrowers become delinquent on their loan repayment obligations. *See* Guide, Ch. 18-3(A). Chapter 18 governs the right of an issuer to repurchase a loan from the mortgage pool in the event borrowers' delinquency continues for a period of months. *See* Guide, Ch. 18-3. It appears to be undisputed that a loan submitted to a GNMA mortgage pool must be repurchased from the pool before its terms and conditions may be modified by the parties to the

Page 9 - FINDINGS AND RECOMMENDATION

loan agreement. *See* Plaintiffs' Memorandum (#67) in Support of their Motion for Partial

Summery [*sic*] Judgment ("Plaintiffs' Memo"), Exh. 6 ("Watson Depo.") at 71:6-19.

　　　　The Guide further provides that, in the event an issuer defaults on its obligations to make

the requisite payments to the security holders, GNMA has the right to:

> Extinguish any redemption, equitable, legal, or other right, title, or interest of the
> Issuer, and anyone claiming through the Issuer, in the mortgages in pools and loan
> packages for which the Issuer has Issuer responsibility. Issuers, subcontract
> servicers, creditors, and others should be aware that any and all right, title, and
> interest of the Issuer in and to pooled mortgages, including but not limited to the
> rights of the Issuer (and of any subcontract servicer) to service the pooled
> mortgages and to earn servicing compensation, are forfeited and cease upon
> extinguishment by Ginnie Mae.

Guide, Ch. 23-3(B).

　　　　Also as noted above, in connection with their supplemental briefing, defendants issued a

further request (#99) for judicial notice, specifically requesting notice of Chapter 6 of the Guide

and of GNMA's 2015 Annual Report. Federal Rule of Evidence 201(d) provides that "[a] court

shall take judicial notice [of an adjudicative fact] if requested by a party and supplied with the

necessary information." An adjudicative fact is subject to judicial notice when the fact is "not

subject to reasonable dispute in that it is either (1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Plaintiffs

opposed defendants' previous request for judicial notice on the ground that any "facts" contained

in the documents at issue were not adjudicative but rather legislative facts; I presume that

plaintiffs would offer that same reasoning in opposition to defendants' currently pending request

for judicial notice. I find that the documents contain facts fit for judicial notice, and recommend

that the request (#99) be granted.

Chapter 6 of the Guide provides in relevant part that issuers are required to pay a fee characterized as a "monthly guaranty fee" to GNMA in connection with each mortgage submitted to a GNMA mortgage pool. Guide, Ch. 6-2(C). GNMA's 2015 Annual Report suggests, consistently with the statements quoted above, that GNMA does not own loans submitted to GNMA mortgage pools, suggesting instead that the risk of nonpayment of pooled mortgages is borne by the investors to whom the pooled and securitized mortgages are sold. *See* GNMA 2015 Annual Report, § 1.

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiffs Iron Hawk and Van Pelt are husband and wife. Each is a citizen and resident of Oregon.

Defendant Bank2 is a bank specializing in United States Department of Housing and Urban Development Section 184 Indian Home Loan Guarantee Program loans to Native Americans. Bank2 is organized under Oklahoma law and is headquartered in Oklahoma. Defendant Dovenmuehle is a subservicer of portfolio loans for Bank2. Dovenmuehle is organized under Delaware law and headquartered in Illinois.

### II.   Material Factual History[1]

On or around February 11, 2010, plaintiffs executed a Deed of Trust – a security instrument memorializing a home mortgage loan in the amount of $158,950 – with plaintiffs

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

named as the "Borrower," Bank2 named as the "Lender," "Fidleity [*sic*] National Title" named as the "Trustee," and Mortgage Electronic Registration Systems, Inc. ("MERS") named as the "beneficiary" of the Deed of Trust. *See* Plaintiffs' Memorandum (#67) in Support of their Motion for Partial Summery [*sic*] Judgment ("Plaintiffs' Memo"), Exh. 1 ("Deed of Trust"). The loan was secured by plaintiffs' Portland, Oregon, residence. *See id.*

On or around March 5, 2010, Bank2 "securitized" the mortgage loan memorialized by the parties Deed of Trust through a program established by GNMA. *See* Declaration of Peter J. Salmon ("Salmon Decl."), Exh. A at D001381, D001387; *see also* Plaintiffs' Memo, Exhs. 2 ("Certification and Agreement"), 3 ("Electronic Pool Submission"). It is undisputed that plaintiffs mortgage loan was included in a "pool" of mortgages enumerated as "718520" and assigned "CUSIP number 36202FE69" by GNMA. *See id.* By and through the instrument by which the mortgage at issue was submitted to pool number 718520, Bank2 expressly "transfer[red], assign[ed], set[] over and otherwise convey[ed] to Ginnie Mae all of [Bank2]'s right, title and interest in and to the pooled mortgages. . . ." Electronic Pool Submission. In addition, the Electronic Pool Submission agreement expressly specified that the interest conveyed by Bank2 to GNMA included all scheduled and unscheduled payments due from the borrowers under their loan agreements. *See id.* Moreover, with respect to the mortgages in pool number 718520, Bank2 certified as follows on March 5, 2010:

> No mortgage in the referenced pool or loan package is now subject to any security agreement between the issuer and any creditor, and upon the release (delivery) of securities backed by the pool or loan package, only Ginnie Mae will have any ownership interest in the pooled mortgages.

Certification and Agreement.

Page 12 - FINDINGS AND RECOMMENDATION

The parties dispute the effect of such "securitization" and of Bank2's express conveyance to Ginnie Mae of all of its "right, title, and interest in and to" plaintiffs' mortgage, expressly including the right to plaintiffs' payments in connection with their loan. In support of their position that, notwithstanding the language quoted above, Bank2 at all times retained all ownership interest in plaintiffs' repayment obligations, defendants offer (i) the declaration testimony of Bank2's Senior Vice President, Head of Mortgage Lending, Gene Watson, that at the time Bank2 decided to initiate a non-judicial foreclosure on plaintiffs' loan, "Bank2 was . . . the owner of the loan. . . ," Declaration of Gene Watson ("Watson Decl. I") dated October 27, 2015, ¶¶ 5, 7, (ii) the declaration testimony of Bank2's controller in charge of accounting and financing, Cynthia Delgado, that "Bank2 at all times has been the owner of the loan and the party to whom payments are due from Plaintiffs," Declaration of Cynthia Delgado ("Delgado Decl.") dated October 27, 2015, ¶ 6, and (iii) the deposition testimony of Watson that Bank2 retained ownership of the loan at all material times, *see* Salmon Decl., Exh. B ("Watson Depo.") at 10:22-24, 11:8-10, 12:21 – 13:1. Defendants further rely on the judicially noticed statements regarding GNMA's business model set forth above, and on the Declaration of Nathan Atchison, a CPA who offers expert opinion as to financial aspects of the securitization of the plaintiffs' mortgage, *see* Declaration of Nathan Atchison ("Atchison Decl."). Atchison testifies that:

5.    The loan at issue was securitized by Bank2 in 2010. The securitization involved Bank2 issuing securities for sale to the public, and receiving cash in exchange for the sale of those securities. My understanding is that Bank2 was an authorized issuer of GNMA-backed securities at the time of the securitization of the loan at issue, and has remained an authorized issuer of GNMA-backed securities from that time until the present.

6.    Since the securitization of the loan at issue in 2010, Bank2 has been required to make funds available on a monthly basis for distribution to the

> holders of the security. Bank2 transfers funds, on a monthly basis, into a
> custodial account at Bank2 that is held in trust for the benefit of the
> GNMA-backed security holders. Bank2 makes the payment required even
> if the borrowers on the underlying loans do not make their monthly
> payments to Bank2. Each month, the Bank of New York, as administrator
> and trustee for the GNMA-backed security program, drafts the full amount
> from that account in order to make the payment to the security holders.

Atchison Decl., ¶¶ 5-6. Atchison further testifies that Bank2 accounted for the securitization of

the mortgage loan on its books "for financial accounting purposes as a sale," but only because it

was required to do so by Financial Accounting Standards Board Accounting Standards

Codification Topic 860; Atchison testifies that such accounting treatment "is separate from the

issue of ownership of the loan. . . [and] is not in any way determinative of the legal

ownership, or beneficiary, of the loan." *Id.,* ¶¶ 9-10.

In support of their contrary position that Bank2 conveyed its ownership interest in the

loan to GNMA when it submitted the mortgage to the pool, plaintiffs note the plain language of

the agreements discussed above, and additionally point to (i) Watson's deposition testimony that

Bank2 received money from GNMA when the mortgage was submitted to its pool, *see* Plaintiffs'

Memo, Exh. 4 ("Watson Depo.") at 10:1-6, (ii) Watson's deposition testimony that Bank2 was

required to remit payments in satisfaction of plaintiffs' repayment obligations to GNMA even in

the event that plaintiffs made no such payments themselves, *see* Plaintiffs' Memo, Exh. 5

("Watson Depo.") at 19:8-24, (iii) Watson's deposition testimony that in the event Bank2 wished

to modify a loan submitted to a GNMA pool, it would first be required to "repurchase [the

mortgage] from the pool," Plaintiffs' Memo, Exh. 6 ("Watson Depo.") at 71:6-19, and (iv)

Bank2's interrogatory response tending to establish that in excess of 90% of plaintiffs' principal

and interest payments were remitted to GNMA and not retained by Bank2, *see* Plaintiffs' Memo,

Exh. 7.  Plaintiffs further rely on the declaration (#88) of Bernard Jay Patterson, a certified fraud

examiner and plaintiffs' (purported) expert regarding mortgage accounting, filed

contemporaneously with and in support of plaintiffs' reply memorandum.  Patterson testifies to

his expert opinion that subsequent to the submission of plaintiffs' mortgage to the pool, Bank2

retained no ownership interest in the loan.  *See* Patterson Decl., ¶¶ 8-20.  Patterson further

testifies that in financial documents filed with the FDIC, Bank2 has at all material times reported

that it does not own any loans either guaranteed by GNMA or pledged as collateral to GNMA.

*See id.*, ¶ 17.

The parties do not offer evidence regarding plaintiffs' missed payments on their mortgage

loan or defendants' decision to initiate non-judicial foreclosure proceedings.  However, it appears

that, for purposes of plaintiffs' motion for partial summary judgment, no party disputes plaintiffs'

allegations that plaintiffs missed a mortgage payment due and owing in June 2013, that

defendants thereafter refused to accept plaintiffs' various tenders of partial payment of their

arrears, or that in March 2015 Bank2 issued a Trustee's Notice of Sale by and through which it

sought to sell plaintiffs' residence via a non-judicial foreclosure.  *See* Second Amended

Complaint, ¶¶ 10-29.

On January 16, 2015, MERS executed an Assignment of Deed of Trust by and through

which MERS purported to assign to Bank2 its purported interest as the beneficiary of the Deed of

Trust memorializing plaintiffs' mortgage loan.  *See* Plaintiffs' Memo, Exh. 8 ("Assignment of

Deed of Trust").  On February 10, 2015, Bank2 in turn appointed Clear Recon Corp.[2] as the

---

[2] It appear that Clear Recon Corp. shares its mailing address and may be co-extensive
with defendants' counsel.

successor trustee in connection with plaintiffs' mortgage loan. *See* Second Amended Complaint,

Exh. 2 ("Appointment of Successor Trustee"). It is plaintiffs' position that both the Assignment

of Deed of Trust and the Appointment of Successor Trustee were recorded in Multnomah

County, and defendants do not dispute that position, although there appears to be no evidence of

record supporting it.

It is plaintiffs' position that on May 29, 2015, Clear Recon Corp. issued a Notice of

Default and Election to Sell plaintiffs' residence via non-judicial foreclosure. Again, defendants

do not appear to dispute this position, but, again, there does not appear to be evidence of record

to support it.

## ANALYSIS

### I.    Defendants' Motion (#89) to Strike the Patterson Expert Opinion Declaration

Defendants move to strike the Patterson declaration on several grounds, first and

primarily because Patterson was not disclosed as an expert witness prior to plaintiffs' proffer of

his declaration on January 27, 2016. As defendants correctly note, experts must be disclosed

pursuant to Federal Civil Procedure Rule 26(a)(2) without need for a discovery request for such

disclosure from an opposing party. *See* Fed. R. Civ. P. 26(a)(2). On that ground, defendants

argue the court should disregard the declaration in its entirety. In the alternative, to the extent the

Patterson declaration constitutes new evidence presented in reply, defendants argue they should

be permitted an opportunity to respond to the declaration, including an opportunity to depose

Patterson, before the evidence may properly be considered by the court. Defendants concede that

counsel for plaintiffs was willing to stipulate to a 14-day set-over to permit defendants an

opportunity to respond to the declaration, but defendants argue that 14 days is insufficient for

such an opportunity to be meaningful.

Second, defendants argue that Patterson's declaration contains improper opinion testimony as to matters of law, including in particular the ownership of any beneficial interest in plaintiffs' mortgage loan following Bank2's submission of the loan to the pool.

Third, defendants assert that Patterson is unqualified to offer expert testimony in this matter.

Defendants have now had a full opportunity to respond to Patterson's declaration, filing in response both a supplemental memorandum in support of their opposition and the Declaration (#98) of Nathan Atchison. In light of that opportunity, no compelling grounds exist for striking Patterson's opinion testimony. I therefore recommend that defendants' motion to strike be denied. To the extent Patterson offers opinion testimony regarding ultimate legal conclusions, such testimony has been disregarded for purposes of the analysis set forth herein.

## II.    Plaintiffs' Entitlement to Partial Summary Judgment as to their Declaratory Judgment Claim

As noted above, plaintiffs seek summary adjudication of their request for this court's declarations that defendant Bank2 is not the beneficiary of plaintiffs' mortgage loan and that neither defendant herein may lawfully proceed with a non-judicial foreclosure on plaintiffs' residence. Defendants appear to offer two mutually incompatible alternative theories in support of their position that Bank2 is in fact the beneficiary of plaintiffs' mortgage loan, and was so as of both February 10, 2015, when Bank2 appointed Clear Recon Corp. as the successor trustee in connection with plaintiffs' mortgage loan, and May 29, 2015, when Clear Recon Corp. issued a Notice of Default and Election to Sell plaintiffs' residence via non-judicial foreclosure.

Specifically, defendants appear to argue both (i) that on January 16, 2015, when MERS executed the Assignment of Deed of Trust by and through which MERS purported to assign to Bank2 its purported interest as the beneficiary of the Deed of Trust memorializing plaintiffs' mortgage loan, MERS had the beneficial interest in question and was empowered to assign it to Bank2, and (ii) that MERS was never the beneficiary of plaintiffs' mortgage loan, but rather that Bank2 has been the beneficiary at all times continuously since the mortgage loan issued, notwithstanding either the provision of the Deed of Trust naming MERS as the beneficiary or Bank2's March 5, 2010, submission of the mortgage loan to the GNMA loan pool. I address each alternative theory in turn, below.

As a preliminary matter, I note that pursuant to the OTDA, only a trustee may initiate a non-judicial foreclosure. *See* Or. Rev. Stat. § 86.764(1). Non-judicial foreclosure is only available to a trustee as follows:

A trustee may not foreclose a trust deed by advertisement and sale in the manner provided in ORS 86.764 to 86.782 unless:

(1)    **The trust deed, any assignments of the trust deed by the trustee or the beneficiary and any appointment of a successor trustee are recorded in the mortgage records in the counties in which the property described in the deed is situated;**

(2)    There is a default by the grantor or other person that owes an obligation, the performance of which is secured by the trust deed, or by the grantor's or other person's successors in interest with respect to a provision in the deed that authorizes sale in the event of default of the provision;

(3)    The trustee or beneficiary has filed for record in the county clerk's office in each county where the trust property, or some part of the trust property, is situated, a notice of default containing the information required by ORS 86.771 and containing the trustee's or beneficiary's election to sell the property to satisfy the obligation;

    (4)    The beneficiary has filed for recording in the official records of the county or counties in which the property that is subject to the residential trust deed is located:

        (a)    A certificate of compliance that a service provider issued to the beneficiary under ORS 86.736 that is valid and unexpired at the time the notice of default is recorded; or

        (b)    A copy of the affidavit with which the beneficiary claimed, under ORS 86.726 (1)(b), an exemption that has not expired;

    (5)    The beneficiary has complied with the provisions of ORS 86.748;

    (6)    The grantor has not complied with the terms of any foreclosure avoidance measure upon which the beneficiary and the grantor have agreed; and

    (7)    An action has not been commenced to recover the debt or any part of the debt then remaining secured by the trust deed, or, if an action has been commenced, the action has been dismissed, except that:

        (a)    Subject to ORS 86.010 and the procedural requirements of ORCP 79 and 80, an action may be commenced to appoint a receiver or to obtain a temporary restraining order during foreclosure of a trust deed by advertisement and sale, except that a receiver may not be appointed with respect to a single-family residence that the grantor, the grantor's spouse or the grantor's minor or dependent child occupies as a principal residence.

        (b)    An action may be commenced to foreclose, judicially or nonjudicially, the same trust deed as to any other property covered by the trust deed, or any other trust deeds, mortgages, security agreements or other consensual or nonconsensual security interests or liens that secure repayment of the debt.

Or. Rev. Stat. § 86.752 (emphasis supplied). Thus, as a matter of Oregon law, non-judicial

foreclosure on plaintiffs' residence is only available to the defendants to the extent the status of

Bank2 as the beneficiary and the appointment by Bank2 of any trustee or successor trustee (or in

Page 19 - FINDINGS AND RECOMMENDATION

the alternative the appointment by the actual beneficiary of either Bank2 or Dovenmuehle as the

trustee or successor trustee) is ascertainable through documents recorded in Multnomah County.

As to whether Bank2 could be the beneficiary of the loan pursuant to MERS' purported

assignment of its purported interest as the beneficiary of the Deed of Trust to Bank2, I note that

in 2013, the Oregon Supreme court issued two decisions, *Brandrup v. ReconTrust Co.*, 353 Or.

668 (2013), and *Niday v. GMAC Mortgage, LLC*, 353 Or. 648 (2013), in which it held that

(under the facts presented to it) MERS was not and could not be a "beneficiary" for purposes of

the Oregon Trust Deed Act. The holdings of *Brandrup* and *Niday* were recently summarized

succinctly by the Oregon Court of Appeals in *Fannie Mae v. Goodrich*, 275 Or. App. 77 (2015):

> In *Brandrup*, the Supreme Court answered four questions of law that had been
> certified by the United States District Court for the District of Oregon, all of
> which arose out of nonjudicial foreclosure proceedings based on trust deeds that
> named MERS as the beneficiary and that purported to authorize MERS to exercise
> the rights of the lender. [*Brandrup*, 353 Or.] at 681. The first certified question
> posed the [following] question . . . : "May an entity, such as MERS, that is neither
> a lender nor a successor to a lender, be a 'beneficiary' as that term is used in the
> (OTDA)?" *Id.* at 673.
>
> The Supreme Court answered that question in the negative:
>
>> "For purposes of former ORS 86.735(1), the 'beneficiary' is the lender to
>> whom the obligation that the trust deed secures is owed or the lender's
>> successor in interest. **Thus, an entity like MERS, which is not a lender,**
>> **may not be a trust deed's 'beneficiary,' unless it is a lender's successor**
>> **in interest.**"
>
> *Id.* at 673-74.
>
> The second certified question, as reframed by the court, concerned the effect of
> language in a trust deed that authorizes MERS to exercise the lender's rights:
>
>> "Is MERS eligible to serve as beneficiary under the Oregon Trust Deed
>> Act where the trust deed provides that MERS 'holds only legal title to the
>> interests granted by Borrower in this Security Instrument, but, if necessary

Page 20 - FINDINGS AND RECOMMENDATION

> to comply with law or custom, MERS (as nominee for Lender and
> Lender's successors and assigns) has the right:  to exercise any or all of
> those interests'?"

*Id.* at 674 (emphasis omitted).  The court answered the second certified question
in the negative as well:

> "Because the provision that MERS 'holds only legal title to the interests
> granted by Borrower in this Security Instrument, but, if necessary to
> comply with law or custom, MERS has the right to exercise any or all of
> those interests,' does not convey to MERS the beneficial right to
> repayment, the inclusion of that provision does not alter the trust deed's
> designation of the lender as the 'beneficiary' or make MERS eligible to
> serve in that capacity."

*Id.*

The third certified question asked, "Does the transfer of a promissory note from
the lender to a successor result in an automatic assignment of the securing trust
deed that must be recorded prior to the commencement of nonjudicial foreclosure
proceedings under former ORS 86.735(1)?"  *Id.* at 673.  The court also answered
"no" to that question:

> "Former ORS 86.735(1) does not require recordation of 'assignments' of a
> trust deed by operation of law that result from the transfer of the secured
> obligation."

*Id.* at 674.  That is, the court held that transfer of a promissory note effects an
assignment of the trust deed by operation of law, but that the OTDA requires
recordation "only of formal, written assignments."  *Id.* at 699 (citations omitted).

The court then reframed the fourth certified question as two subquestions.  The
first subquestion asked, "'Does the OTDA allow MERS to hold and transfer legal
title to a trust deed as nominee for the lender, after the note secured by the trust
deed is transferred from the lender to a successor or series of successors?'"  *Id.* at
674-75.  The court answered:

> "'No.'  For purposes of the OTDA, the only pertinent interests in the trust
> deed are the beneficial interest of the beneficiary and the legal interest of
> the trustee.  MERS holds neither of those interests in these cases, and,
> therefore, *it cannot hold or transfer legal title to the trust deed.*  It is
> immaterial whether the note secured by the trust deed has previously been
> 'transferred from the lender to a successor or series of successors.'"

*Id.* at 675 (emphasis added).  The second subquestion asked, "'Does MERS nevertheless have authority as an agent for the original lender and its successors in interest to act on their behalves with respect to the transfer of the beneficial interest in the trust deed or the nonjudicial foreclosure process?'"  *Id.*  The court answered:

> **"The power to transfer the beneficial interest in a trust deed or to foreclose it follows the beneficial interest in the trust deed.  The beneficiary or its successor in interest holds those rights.** MERS's authority, if any, to perform any act in the foreclosure process therefore must derive from the original beneficiary and its successors in interest. We are unable to determine the existence, scope, or extent of any such authority on the record before us."

*Id.* []

After announcing those legal principles in *Brandrup*, the Supreme Court applied them to the record in *Niday*, a summary judgment case.  As pertinent here, the Supreme Court concluded that a genuine issue of material fact existed as to the validity of the successor trustee's appointment and, as a result, its authority to pursue a nonjudicial foreclosure under the OTDA.  *Niday*, 353 Ore. at 666-67. The Supreme Court explained that the trial court had apparently relied on a document showing that MERS had appointed Executive Trustee Services as successor to the original trustee; but, the Supreme Court held, **"appointments of a successor trustee may only be made by the trust deed beneficiary, and, as discussed, MERS is not, and never has been, the beneficiary of the trust deed for purposes of the OTDA."**  *Niday*, 353 Ore. at 666 (internal citation omitted).

In addition, the court addressed whether MERS was the beneficiary's agent for purposes of initiating the foreclosure.  The court drew heavily on its discussion in *Brandrup*:

> "As this court recognized in *Brandrup*, 353 Ore. at 705-09, even if MERS lacks authority to act as the trust deed's beneficiary, it may have authority to act on behalf of the beneficiary *if it can demonstrate that it has an agency relationship with the beneficiary and that the agency agreement is sufficiently expansive.*  Although in *Brandrup* we discussed that possibility in connection with the issue of MERS' authority to assign a trust deed, it would seem to apply equally to the present issue of MERS's authority to foreclose the trust deed. *In either case, MERS' authority to act as the beneficiary's agent depends on who succeeded to the lender's rights, whether those persons manifested consent that MERS act on their behalf*

Page 22 - FINDINGS AND RECOMMENDATION

*and subject to their control, and whether MERS has agreed to so act.*

> "But as far as we can tell, there is nothing in the summary judgment record in this case that identifies the successors to the original lender's interests or shows that MERS is authorized, as the agent of the successors to the original lender's interests, to initiate or direct a nonjudicial foreclosure proceeding under the OTDA. There is some evidence that the current owner of the note is Aurora Bank and that Aurora Bank is a member of MERS. But there is no evidence as to whether Aurora Bank is a successor to the original lender's interests. Nor is there evidence of an agency agreement between Aurora Bank and MERS, or between MERS and its members as a whole, much less one that authorizes MERS to initiate foreclosures on behalf of Aurora Bank. Further, there is some suggestion that GMACM is the 'holder' of the note. If the note is negotiable, it is possible that GMACM is a successor to the original lender's interests or that both Aurora Bank and GMACM share that role; however, neither the record nor the parties' arguments establish those matters beyond genuine dispute."

(Original emphasis omitted; emphasis added.)  Accordingly, the Supreme Court concluded that the trial court had erred in granting summary judgment in *Niday.*

*Fannie Mae v. Goodrich*, 275 Or. App. 77, 82-86 (2015) (internal modifications, footnotes omitted; italicized emphasis original; bolded emphasis supplied).

While defendants argue that *Brandrup* and *Niday* do not absolutely foreclose the possibility that MERS could be a beneficiary, noting that where MERS acts as a lender's successor in interest or independently receives authority to act as a beneficiary's agent, it can have the powers of a beneficiary under *Brandrup*, defendants fail to offer any evidence or argument that, here, MERS was in fact the successor in interest of the actual beneficiary of the mortgage loan, or actually received independent authority to act as the actual beneficiary's agent. In the absence of any such evidence, a finder of fact could not reasonably conclude that MERS could be the loan beneficiary here. Lacking any cognizable beneficial interest in the loan, MERS necessarily had no beneficial interest it could convey to Bank2 as of January 16, 2015, when it

purported to do so. It follows that Bank2 cannot be the loan beneficiary pursuant to the

purported assignment from MERS.

As to whether Bank2 remained the beneficiary of the loan at all times continuously from

the date the loan issued, notwithstanding either the provision of the Deed of Trust naming MERS

as the beneficiary or Bank2's March 5, 2010, submission of the mortgage loan to the GNMA loan

pool, the chief problem with defendants' position is that it is simply inconsistent with the plain

language of the Electronic Pool Submission and the Certification and Agreement by and through

which the mortgage was submitted to the loan pool for securitization. As noted above, the

Electronic Pool Submission expressly provided that Bank2 "transfer[red], assign[ed], set[] over

and otherwise convey[ed] to Ginnie Mae all of [Bank2]'s right, title and interest in and to the

pooled mortgages" and that the interest conveyed by Bank2 to GNMA included all scheduled and

unscheduled payments due from the borrowers under their loan agreements, Electronic Pool

Submission, while Bank2 certified by and through the Certification and Agreement that as a

result of the submission of the mortgage to the pool "only Ginnie Mae w[ould] have any

ownership interest in the pooled mortgages," Certification and Agreement.

Moreover, defendants' position is further contravened by other evidence of record –

including some of the judicially noticed statements of GNMA regarding its own business model

– tending to establish that Bank2 ceased to possess any interest in the loan, other than a loan

servicer's interest, following submission of the mortgage to the pool. Such evidence includes

Watson's deposition testimony that Bank2 received money from GNMA when the mortgage was

submitted to its pool, *see* Watson Depo. at 10:1-6, Watson's deposition testimony and GNMA's

consistent statement that in the event Bank2 wished to modify a loan submitted to a GNMA pool,

Page 24 - FINDINGS AND RECOMMENDATION

it would first be required to "repurchase [the mortgage] from the pool," Watson Depo. at 71:6-19, *see also* Guide Ch. 18-3, Bank2's interrogatory response tending to establish that in excess of 90% of plaintiffs' principal and interest payments were remitted to GNMA and not retained by Bank2, *see* Plaintiffs' Memo, Exh. 7, Patterson's testimony regarding Bank2's accounting treatment of the loan following its submission to the pool, *see* Patterson Decl., ¶¶ 8-20, evidence of an issuer's obligation, following submission of a loan to the pool, to remit all borrowers' principal and interest payments (less a servicer fee to be retained by the issuer and a guaranty fee to be paid to GNMA) to the security holders, *see* Guide, Ch. 15, and evidence that issuers lack any right to retain any proceeds from such payments beyond the servicing fee, even in the event that payment of such proceeds to security holders proves impossible, *see* Guide Ch. 15-2(C).

Defendants counter that it is not GNMA's practice to take ownership of mortgages submitted to such pools, supporting that position with the judicially noticed statements referenced above that GNMA has made regarding its business model, and invite the court to infer therefrom that notwithstanding the express contrary language of the Electronic Pool Submission and the Certification and Agreement, Bank2 never ceased to maintain its ownership interest, and therefore beneficial interest, in the plaintiffs' mortgage. However, the judicially noticed statements do not in any degree suggest that Bank2 could never have conveyed away its ownership interest in plaintiff's mortgage, but rather are entirely consistent with the proposition that Bank2 conveyed its ownership interest in the mortgage to GNMA upon submission thereof to the pool, and that GNMA immediately passed the conveyed ownership therein on to another entity or entities, presumably either to the mortgage pool itself, to the administrator, funds custodian, document custodian, processing agent, and/or central paying and transfer agent of the

Page 25 - FINDINGS AND RECOMMENDATION

mortgage pool, or, perhaps most likely, to the investors/holders of the securities backed by the pool. That is, while the proffered and noticed evidence tends to establish that GNMA was not the beneficiary of the loan when MERS purported to transfer its beneficial interest therein to Bank2, when Bank2 appointed Clear Recon Corp. as successor trustee, or when Clear Recon Corp. noticed the non-judicial foreclosure on plaintiffs' residence, it has no tendency whatsoever to establish that Bank2 was the beneficiary at any of those times; moreover, it is clear that plaintiffs' evidentiary proffer in support of their partially dispositive motion is sufficient to place the burden so to establish squarely on defendants (that is, because plaintiffs' proffer tends to establish that Bank2 conveyed away the interest requisite to support its purported appointment of Clear Recon Corp. as successor trustee, it is necessarily defendants' burden to establish either that Bank2's express conveyance of its ownership interest was void or that the interest was subsequently conveyed back to Bank2 by an entity with authority to do so).

Similarly, defendants argue, correctly, that GNMA generally extinguishes an issuer's interest in a mortgage loan only following the issuer's default of its obligations to make payments to GNMA, and then only by affirmatively taking steps to extinguish the issuer's interest therein, *see* Guide, Ch. 23, and that the evidence of record here contains no suggestion either that Bank2 ever defaulted on its payment obligations or that GNMA ever affirmatively extinguished Bank2's interest. On this basis, defendants further argue both that GNMA cannot be the beneficiary of the loan and that Bank2 retains an interest – impliedly, in defendants' argument, a full ownership interest – in the loan, notwithstanding submission thereof to the pool. Again, however, the fact that GNMA has not formally extinguished Bank2's interest in the loan does not have any tendency to establish that Bank2's interest therein is the crucial beneficial interest, and in any

event, the plain language of Chapter 23-3(B) of the Guide (GNMA extinguishment of an issuer's interest in a loan means that "any and all right, title, and interest of the Issuer in and to pooled mortgages, *including but not limited to the rights of the Issuer (and of any subcontract servicer) to service the pooled mortgages and to earn servicing compensation*, are forfeited and cease") strongly suggests that, following submission of a loan to the pool, an issuer's residual interest in the loan is limited to that of a loan servicer in collecting borrower payments (and receiving compensation for so doing) and in remitting the proceeds therefrom to the person or persons possessing the right to retain them (namely, the security holders). Guide, Ch. 23-3(B) (emphasis supplied); *see also* Guide, Ch. 1-11(C) (establishing that following submission of a mortgage to a GNMA pool, the issuer retains a servicer's interest in the mortgage and the obligation to service the loan).

Finally, defendants point to the testimony of Bank2's Senior Vice President and of its controller in charge of accounting and financing that at the material times Bank2 owned the loan, *see* Watson Decl. I, ¶¶ 5, 7, Watson Depo. at 10:22-24, 11:8-10, 12:21 – 13:1, Delgado Decl., ¶ 6, and to Atchinson's testimony that Bank2's accounting treatment of the loan "is separate from the issue of ownership of the loan. . . [and] is not in any way determinative of the legal ownership, or beneficiary, of the loan," Atchison Decl., ¶¶ 9-10. However, while Atchison's testimony is sufficient to create a question of fact regarding the probative value of Patterson's testimony as to Bank2's accounting treatment of the loan, plaintiffs' argument does not depend critically on Patterson's testimony; and the testimony of Watson and Delgado as to the ultimate issue of Bank2's interest in the loan at the time the foreclosure was noticed is not supported by underlying facts and cannot overcome the legal effect of the Electronic Pool Submission or of the

Certification and Agreement, which speak for themselves and are enforceable according to their own terms as a matter of law notwithstanding the testimony of Bank2's employees.

Because defendants' evidentiary submissions are insufficient to create any material question of fact as to whether Bank2 could have been the beneficiary of the loan at the time it purported to appoint Clear Recon Corp. as the successor trustee (or at any other material time), plaintiffs are entitled to the requested declaration that Bank2 is not the beneficiary of plaintiffs' mortgage loan. In addition, because defendants have not met their burden to create a question of fact as to whether documents recorded in Multnomah County could establish that either of them is either the beneficiary or the trustee of the loan (or that either enjoyed such status at the time Bank2 purported to appoint Clear Recon. Corp as the successor trustee), plaintiffs are further entitled to the requested declaration that neither defendant herein may lawfully proceed with a non-judicial foreclosure on plaintiffs' residence (barring any future assignment of the requisite interest to one of the defendants from a party with the authority to make such an assignment). In consequence, plaintiffs' motion (#66) for partial summary judgment should be granted, and the court should issue the requested declarations.

## CONCLUSION

For the reasons set forth above, defendants' request (#99) for judicial notice should be granted, defendants' motion (#89) to strike should be denied, plaintiffs' motion (#66) for partial summary judgment should be granted, and this court should declare both that defendant Bank2 is not the beneficiary of plaintiffs' mortgage loan and that the defendants herein may not lawfully proceed with a non-judicial foreclosure on plaintiffs' residence.

Page 28 - FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 10th day of April, 2016.

Honorable Paul Papak
United States Magistrate Judge